Barry I. Levy (BL 2190)
Michael P. Versichelli (MV 2692)
Max Gershenoff (MG 4648)
Brian L. Bank (BB 5995)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
Telephone:     (516) 357-3000
Facsimile:     (516) 357-3333

*Counsel for Plaintiffs, Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO GENERAL
INSURANCE COMPANY and GEICO
CASUALTY CO.,

|  |  |
|---|---|
| Plaintiffs, | Docket No.: CV 12-2448 (JG)(VMS) |
| -against- | **Plaintiff Demands a Trial By Jury** |

VLADIMIR GRINBERG,
OLGA GRINBERG,
MICKAELLE DOUGHERTY, PH.D., and
ERNEST BONAPARTE, PH.D.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## <u>AMENDED COMPLAINT</u>

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company, and GEICO Casualty Co. (collectively, "GEICO"), by and through their

counsel, Rivkin Radler LLP, as and for their Amended Complaint against Defendants Vladimir

Grinberg, Olga Grinberg, Mickaelle Dougherty, Ph.D., and Ernest Bonaparte, Ph.D., allege, upon

information and belief, as follows:

## INTRODUCTION

1.      This action seeks to recover more than $2,096,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges for medically unnecessary, illusory, or otherwise unreimbursable psychology services (i.e., diagnostic interviews, psychological testing, and psychotherapy sessions) purportedly rendered to New York automobile accident victims.

2.      Succinctly:

(i)      Defendants Vladimir Grinberg ("Grinberg"), Olga Grinberg ("O. Grinberg"), and former Defendant John R. Braun, Ph.D. ("Braun") created a series of mirror-image professional entities – former Defendants Five Boro Psychological Services, P.C. ("Five Boro"), All Boro Psychological Services, P.C. ("All Boro"), and Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. ("Five Boro PLLC") (collectively the "Former PC Defendants") – in order to establish vehicles through which fraudulent claims for no-fault reimbursement could be submitted to insurers, including GEICO;

(ii)     Five Boro and All Boro, although nominally owned on paper by licensed psychologist Braun, actually were secretly and unlawfully owned and controlled by Grinberg and O. Grinberg, who are not licensed psychologists;

(iii)    Five Boro PLLC, although nominally owned on paper by licensed psychologist Braun and licensed social worker Grinberg, actually was secretly and unlawfully owned and controlled – in part – by O. Grinberg, who is not licensed as a psychologist or social worker;

(iv)    Grinberg, O. Grinberg, and the Former PC Defendants obtained patient referrals by paying illegal kickbacks to a series of healthcare clinics in the New York metropolitan area that catered to high volumes of fully ambulatory patients who claimed to have been involved in automobile accidents;

(v)     once the healthcare clinics referred patients to the Former PC Defendants for "treatment" pursuant to the kickbacks, the Defendants and the former Defendants in this action purported to subject the patients to a battery of medically and psychologically unnecessary and/or illusory psychological services without regard for their individual symptoms or presentment, solely in order to maximize the no-fault charges that the Defendants and former Defendants in this action could submit to GEICO and other insurers;

2

(vi) the Defendants and the former Defendants caused the Former PC Defendants to submit large-scale no-fault insurance billing for the useless and/or illusory psychological services even though the Former PC Defendants never were eligible to submit billing for the services because they were fraudulently incorporated, owned and controlled by non-psychologists and/or non-social workers, and split fees with non-psychologists and/or non-social workers in contravention of New York law; and

(vii) the Defendants and the former Defendants caused the Former PC Defendants to submit large-scale no-fault insurance billing for the useless psychological services even though, in most cases, the Former PC Defendants were not eligible to submit billing for the services because the treatments were not provided by the Former PC Defendants' employees.

3.    The Defendants fall into the following categories:

(i)    Defendant Grinberg is licensed as a social worker, but is not and never has been licensed as a psychologist. Even so, he secretly and unlawfully owned and controlled All Boro and Five Boro in contravention of New York law.

(ii)    Defendant O. Grinberg is not and never has been licensed as a psychologist or social worker. Even so, she secretly and unlawfully owned and controlled the Former PC Defendants in contravention of New York law.

(iii)    Defendants Mickaelle Dougherty, Ph.D. ("Dougherty") and Ernest Bonaparte, Ph.D. ("Bonaparte")(collectively, the "Treating Defendants") are psychologists licensed to practice in New York, and purported to perform many of the fraudulent psychological services that were billed through the Former PC Defendants to GEICO.

4.    The former Defendants fall into the following categories:

(i)    The Former PC Defendants are two fraudulently incorporated New York psychology professional corporations and one fraudulently organized New York psychology professional limited liability corporation through which the psychological services purportedly were performed and billed to New York automobile insurance companies, including GEICO;

(ii)    Former Defendant Braun is a psychologist licensed to practice in New York, purported to own the Former PC Defendants, and purported to perform some of the fraudulent psychological services that were billed through the Former PC Defendants to GEICO; and

(iii)    Former Defendants Walter Spear, Ph.D. ("Spear"), Dijana Blacic, Ph.D. ("Blacic"), Kenneth Diamond, Ph.D. ("Diamond"), Yevgeniy Margulis, Ph.D. ("Margulis"), Frances Mendelsohn, Ph.D. ("Mendelsohn"), and Richard Mays,

3

Ph.D. ("Mays") (collectively, the "Former Treating Defendants") are psychologists licensed to practice in New York, and purported to perform most of the fraudulent psychological services that were billed through the former PC Defendants to GEICO.

5.      As discussed below, the Defendants at all relevant times have known that:  (i) the Former PC Defendants were owned and controlled, either in whole or in part, by unlicensed indivdiduals in contravention of New York law; (ii) the Former PC Defendants engaged in illegal fee splitting with unlicensed indivdiduals in contravention of New York law; (iii) the kickback arrangements with the referring healthcare clinics were illegal and designed to provide the Former PC Defendants with the opportunity to bill GEICO and other insurers for medically and psychologically unnecessary services; (iv) the psychological services that were billed to GEICO through the Former PC Defendants were ordered and performed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols solely designed to maximize charges to GEICO and other insurers, and not because they were medically or psychologically necessary or designed to facilitate the treatment of or otherwise benefit the patients who were subjected to them; (v) the documents submitted by the Defendants in support of the charges for the psychological services, as well as the billing that the Defendants submitted seeking payment from GEICO, were false and misleading in several material respects; and (vi) the psychological services that were billed to GEICO through the Former PC Defendants were performed by independent contractors, not by the Former PC Defendants' employees, in contravention of New York law.

6.      The Defendants do not now have, and never had, any right to be compensated for the bills they have submitted through the Former PC Defendants to GEICO and to other New York automobile insurers.  The charts annexed hereto as Exhibits "1" through "3" summarize, in

part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

## PARTIES

### I.    Plaintiffs

7.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

8.     Defendant Grinberg is a New York licensed social worker who resides in and is a citizen of New York. Grinberg – who is not a licensed psychologist – secretly owned, controlled, and derived economic benefit from the operation of Five Boro and All Boro in contravention of New York law. He also was the co-owner of Five Boro PLLC.

9.     On or about February 29, 2012, a federal indictment (the "February 2012 Indictment") was unsealed in the United States District Court for the Southern District of New York charging Grinberg with health care fraud, conspiracy, mail fraud, and conspiracy to commit money laundering in connection with a systematic scheme to defraud New York automobile insurance companies of more than $275,000,000.00 under New York's no-fault insurance laws.

10.    On or about June 26, 2013, Grinberg pleaded guilty to – among other things – conspiracy to commit healthcare fraud and conspiracy to commit money laundering in connection with his ownership and control of the Former PC Defendants (the "June 2013 Plea Agreement"). Copies of the February 2012 Indictment, the June 2013 Plea Agreement, and Grinberg's Sentencing Memorandum collectively are annexed hereto as Exhibit "4."

11.     In his Sentencing Memorandum, Grinberg admitted facts indicating that he secretly and unlawfully owned and controlled All Boro and Five Boro in contravention of New York law. See Exhibit "4".

12.     Defendant O. Grinberg resides in and is a citizen of New York. O. Grinberg never has been licensed as a psychologist or social worker, yet nonetheless secretly and unlawfully owned, controlled, and derived economic benefit from the Former PC Defendants in contravention of New York law.

13.     Defendant Dougherty resides in and is a citizen of New York.  Dougherty is a New York licensed psychologist and purported to perform many of the fraudulent psychological services that were billed through the Former PC Defendants to GEICO.  At all relevant times, Dougherty was associated with the Former PC Defendants as an independent contractor, rather than as an employee.

14.     Defendant Bonaparte resides in and is a citizen of New York.  Bonaparte is a New York licensed psychologist and purported to perform many of the fraudulent psychological services that were billed through All Boro and Five Boro PLLC to GEICO.  At all relevant times, Bonaparte was associated with All Boro and Five Boro PLLC as an independent contractor, rather than as an employee.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

6

16.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 through 1968 (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

17.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

18.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws

19.     GEICO underwrites automobile insurance in New York.

20.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 through 5109) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65-1.1 through 65-4.11) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to individuals involved in New York automobile accidents ("Insureds").

21.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services.

22.     An Insured can assign the right to No-Fault Benefits to healthcare service providers.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as a

"Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

23.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or collect No-Fault Benefits if they were unlawfully incorporated. In New York, only a licensed psychologist may: (i) practice psychology; (ii) own and control a professional service corporation authorized to practice psychology; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services. Hence, unlicensed individuals may not: (i) practice psychology; (ii) own or control a professional service corporation authorized to practice psychology; (iii) employ or supervise psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

24.     Likewise, in New York, only a licensed social worker may own or control a limited liability company authorized to practice social work.

25.     The No-Fault Laws establish that psychological healthcare service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting with unlicensed individuals or entities, which is prohibited by, inter alia, New York's Education Law.

26.     The No-Fault Laws also make clear that psychological healthcare service providers are not eligible to receive No-Fault Benefits if they pay kickbacks for their patient referrals, conduct which is prohibited by, inter alia, the New York Education Law.

27.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12), states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement
> under section 5102(a)(1) of the Insurance Law if the provider fails

to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York . . . .

28.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

29.     Pursuant to Section 403 of the New York State Insurance Law, all NF-3s submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     The Defendants' Fraudulent Scheme

30.     Beginning in 2004 and continuing through late 2013, the Defendants masterminded and implemented a complex fraudulent scheme in which the Former PC Defendants were used to bill the New York automobile insurance industry millions of dollars for medically and psychologically useless, illusory, and otherwise unreimbursable psychology services.

### A.     The Fraudulent Incorporation of the Former PC Defendants

31.     In early 2004, Grinberg and O. Grinberg commenced a search for a licensed psychologist who would be willing to sell the use of his medical license to them so that they could fraudulently incorporate a psychological professional corporation and use it to submit large-scale fraudulent no-fault billing to insurers.

32.     In early 2004, Grinberg and O. Grinberg recruited Braun, a licensed psychologist who was willing to sell the use of his psychology license to Grinberg and O. Grinberg so that they could fraudulently incorporate Five Boro.

33.     Thereafter, in mid-2005, Grinberg and O. Grinberg grew concerned that the volume of fraudulent no-fault insurance billing they were causing to be submitted through Five Boro would draw attention to the scheme.

34.     Accordingly, in mid-2005, Grinberg and O. Grinberg again recruited Braun to sell the use of his psychology license to them so that they could fraudulently incorporate All Boro, reduce the volume of fraudulent billing they submitted through any single professional corporation, and thereby avoid detection and perpetuate their scheme.

35.     In order to circumvent New York law and to induce the State Education Department to issue certificates of authority authorizing Five Boro and All Boro to practice psychology, Grinberg and O. Grinberg entered into a secret scheme with Braun. In exchange for a designated salary or other form of compensation, in 2004 and 2005, Braun agreed to falsely represent in the certificates of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director, and officer of Five Boro and All Boro and that he truly owned, controlled, and practiced through Five Boro and All Boro.

36.     Once Five Boro and All Boro were fraudulently incorporated, Braun ceded true beneficial ownership and control over Five Boro and All Boro to Grinberg and O. Grinberg.

37.     Grinberg and O. Grinberg, rather than Braun, provided all start-up costs and investment in Five Boro and All Boro. Braun did not incur any costs to establish Five Boro and All Boro, nor did he invest any money in the professional corporations that he purported to own.

38.     Braun never was the true shareholder, director, or officer of Five Boro and All Boro, and never had any true ownership interest in or control over Five Boro and All Boro. True ownership and control over Five Boro and All Boro rested at all times entirely with Grinberg and O. Grinberg, who used the façade of Five Boro and All Boro to do indirectly what they were forbidden from doing directly: namely, to charge for and derive economic benefit from licensed psychologists' services.

39.     Throughout the course of Braun's relationship with Grinberg and O. Grinberg, all decision-making authority relating to the operation and management of Five Boro and All Boro was vested entirely with Grinberg and O. Grinberg. In addition, Braun neither controlled nor maintained any of Five Boro's or All Boro's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of Five Boro's or All Boro's financial affairs; never supervised any of Five Boro's or All Boro's employees or independent contractors, and was completely unaware of the most fundamental aspects of how Five Boro and All Boro operated. In reality, Braun never was anything more than a de facto employee of Grinberg and O. Grinberg.

40.     In early 2010, Grinberg and O. Grinberg grew concerned that the volume of fraudulent no-fault insurance billing they were causing to be submitted through Five Boro and All Boro would draw attention to the scheme.

41.     Accordingly, in early 2010, Grinberg and O. Grinberg organized Five Boro PLLC, to reduce the volume of fraudulent billing submitted through All Boro and Five Boro, avoid detection, and thereby perpetuate their scheme.

42.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Five Boro PLLC to practice

psychology, O. Grinberg entered into a secret scheme with Grinberg and Braun. In exchange for a designated salary or other form of compensation, in 2010, Braun and Grinberg agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that they were the sole shareholders, directors, and officers of Five Boro PLLC and that they solely owned, controlled, and practiced through Five Boro PLLC.

43.    Braun and Grinberg never were the sole shareholders, directors, or officers of Five Boro PLLC. Rather, Braun had no genuine ownership interest in or control over Five Boro PLLC, and in actuality Grinberg and O. Grinberg owned and controlled Five Boro PLLC.

44.    Throughout the course of Five Boro PLLC's existence, all decision-making authority relating to the operation and management of Five Boro PLLC was vested entirely with Grinberg and O. Grinberg. Braun never controlled or maintained any of Five Boro PLLC's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities that were responsible for handling any aspect of Five Boro PLLC's financial affairs; never supervised any of Five Boro PLLC's employees or independent contractors, and was completely unaware of the most fundamental aspects of how Five Boro PLLC operated. In reality, Braun never was anything more than a de facto employee of Grinberg and O. Grinberg.

45.    In keeping with the fact that Grinberg and O. Grinberg – rather than Braun – were the true owners of the Former PC Defendants, they caused large sums of money to be diverted from the Former PC Defendants to themselves, while at the same time attempting to conceal the transfers and the provenance of the funds.

46.    For instance, in March 2012, the month after the February 2012 Indictment issued, Grinberg and O. Grinberg caused three brand-new bank accounts to be opened for the

Former PC Defendants at TD Bank, and began to deposit the PC Defendants' revenues into those accounts, in an attempt to conceal the forward-looking disposition of their assets.

47. Thereafter, Grinberg and O. Grinberg began to shuttle money amongst the Former PC Defendants' bank accounts, and then caused more than $250,000.00 to be withdrawn from the Former PC Defendants' bank accounts in untraceable cash, which upon information and belief was diverted to Grinberg and O. Grinberg, and caused more than $270,000.00 to be paid over in checks to O. Grinberg that were structured to avoid financial reporting requirements.

### B. The Kickbacks

48. The Former PC Defendants had no fixed treatment locations of any kind, did not maintain stand-alone practices, were not the owners or leaseholders in the real property from which they purported to provide psychological services, did not employ their own support staff, and did not advertise or market their services to the general public.

49. Instead, the Former PC Defendants obtained access to Insureds through the payment of kickbacks by Grinberg, O. Grinberg, and the Former PC Defendants to a network of healthcare clinics (the "Clinics") located throughout the New York metropolitan area that specialized in treating patients with no-fault insurance who claimed to have been injured in automobile accidents.

50. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

51. The kickbacks that Grinberg, O. Grinberg, and the Former PC Defendants provided to these Clinics were disguised as ostensibly legitimate fees to "rent" space or personnel from the Clinics. In fact, these were "pay-to-play" arrangements that caused the

Clinics to provide access to Insureds and to steer the Insureds to the Former PC Defendants, with the amount of the payments based upon the expected volume of Insureds that the Clinics would refer to the Former PC Defendants for "treatment."

52.     In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to one of the Former PC Defendants for psychological treatments, regardless of individual symptoms, presentment, or – in virtually every case – the total absence of any psychological problems arising from any automobile accident.

53.     The referrals typically were made by a receptionist or some other non-medical personnel at the Clinics who simply directed or "steered" the Insureds to the Former PC Defendants' associates, who were given access to the Clinics' offices on a transient basis pursuant to the kickbacks provided by Grinberg, O. Grinberg, and the Former PC Defendants.

54.     The February 2012 Indictment explained the mechanics of the Clinics' operations as follows:

> In order to take advantage of the patient-friendly provisions of the No-Fault Law, numerous medical clinics were created solely to defraud insurance companies under the No-Fault Law (the "No-Fault Clinics"). While purporting to be legitimate medical care clinics specializing in treating the Patients, the No-Fault Clinics were, in fact, medical fraud mills that routinely billed automobile insurance companies under the No-Fault Law for medical treatments that were either (i) never provided and/or (ii) unnecessary, because the Patients did not medically need the treatments.

See Exhibit "4."

55.     Likewise, the February 2012 Indictment explained the mechanics of the Defendants' kickback scheme:

> [T]he [individuals who controlled the No-Fault Clinics] arranged for other . . . entities to provide excessive and unnecessary medical treatments based on referrals from the No-Fault Doctors (the

14

"Modality Clinics").  The Modality Clinics [such as the Former PC Defendants in the present case] provided additional medical treatments and supplies, which were fraudulently billed to the automobile insurance companies.   These additional treatments included, but were not limited to, . . . psychology . . ., among others.  In return, the [individuals who controlled the No-Fault Clinics] received cash kickbacks for each referral from other individuals who . . . owned, operated and controlled the Modality Clinics (the "Modality Clinic Controllers") [such as Grinberg and O. Grinberg in the present case].

. . .

[A]s described above, the Modality Clinic Controllers paid kickbacks to the [individuals who controlled the No-Fault Clinics] in return for Patient referrals.  The Modality Clinic Controllers paid a portion of the kickback money to the [individuals who controlled the No-Fault Clinics] by providing checks to, the No-Fault Clinic Accounts that were often falsely characterized as "rent" payments for the use of space at the No-Fault Clinics by the Modality Clinics.  These "rent" checks had the dual purpose of satisfying some of the monies owed for kickbacks and also falsely representing to the automobile insurance companies that the business relationship between the No-Fault Clinics and the Modality Clinics was legitimate.  Additionally, other expenses of the No-Fault Clinics were sometimes paid by check directly from the Modality Clinic Accounts as an additional means of making kickback payments to the [individuals who controlled the No-Fault Clinics].   Finally, on some occasions, the Modality Clinic Controllers paid a portion of the kickbacks owed to the [individuals who controlled the No-Fault Clinics] by structuring checks of less than $10,000 to the [individuals who controlled the No-Fault Clinics], who, among other things, provided some of these checks to check cashers to convert to cash . . . .

See Exhibit "4."

### C.    The Defendants' Fraudulent Treatment and Billing Protocol

56.    Every Insured who was referred by the Clinics to the Former PC Defendants pursuant to Grinberg's, O. Grinberg's, and the Former PC Defendants' kickbacks was subjected to a virtually identical series of unnecessary psychological services that were provided by the Treating Defendants, Former Treating Defendants, and Braun, among others, pursuant to a

fraudulent, pre-determined protocol. Each step in the fraudulent "treatment" protocol was designed to falsely reinforce the rationale for the previous step, provide a false justification for the subsequent step, and justify the billing that was submitted to GEICO.

       **1.    The Fraudulent "Psychological Testing" Charges**

57.    Immediately after an Insured was referred to one of the Former PC Defendants pursuant to the kickbacks provided by the Former PC Defendants, Grinberg, and O. Grinberg, the Defendants purported to provide the Insured with a battery of medically and psychologically useless psychological tests.

58.    The Defendants then caused the psychological testing to be billed to GEICO under current procedural terminology ("CPT") codes 96100 or 96101, virtually always for five hours of testing at a rate of $139.30 per hour.  This resulted in routine charges of $696.55 per Insured.

59.    The psychological testing was fraudulent inasmuch as it was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, solely pursuant to the kickback arrangements between the Former PC Defendants, Grinberg, O. Grinberg, and the Clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

60.    In actuality, the tests were nothing more than a handful of pre-printed checklists and inventories that automatically were distributed to the Insureds by the front-desk receptionists at the Clinics pursuant to the kickbacks that Grinberg, O. Grinberg, and the Former PC Defendants paid to the Clinics.  The Insureds then were invited to check off the psychological symptoms they purportedly were experiencing.

61.     Neither the Treating Defendants, Former Treating Defendants, Braun, nor any other psychologists associated with the Former PC Defendants engaged in any independent assessment of any Insured's discrete symptoms or presentment before the Insureds were handed the psychological tests by the Clinic receptionists.

62.     The Defendants' charges for the psychological testing therefore were fraudulent inasmuch as the testing was performed, to the extent it was performed at all, pursuant to a pre-determined fraudulent treatment protocol and was not designed to benefit the Insureds that were subjected to it.

63.     In keeping with this fraudulent treatment protocol, the Defendants purported to provide an identical battery of psychological tests to virtually every Insured, without regard for their individual circumstances or presentment.  Specifically, the Defendants purported to provide virtually every Insured with the following psychological tests:

(i)     Beck Depression Inventory;

(ii)    Beck Hopelessness Scale;

(iii)   Beck Anxiety Inventory;

(iv)    Mental Status Examination;

(v)     Pain Patient Profile; and

(vi)    Posttraumatic Stress Diagnostic Scale.

64.     Furthermore, the Defendants' charges for the psychological testing were fraudulent because – notwithstanding the Defendants' misrepresentations that the tests virtually always took five hours to perform – the tests never took more than one hour to administer, score, and interpret, to the extent that they were performed in the first instance.

65.     Defendants routinely billed for almost, and frequently more than, twenty-four (24) hours of psychological testing and other psychological services that allegedly were performed by a _single_ psychologist on a _single date of service_.  For example:

(i)     The Defendants billed for fifteen (15) hours of psychological testing allegedly performed by Marvin Weiner, Ph.D. at Five Boro on July 13, 2004.  On that same date, Marvin Weiner, Ph.D. _also_ allegedly performed three diagnostic interview examinations, two 45-50 minute psychotherapy sessions, and three record review and evaluations – all of which were billed by the Defendants through Five Boro to GEICO.

(ii)    The Defendants billed for ten (10) hours of psychological testing allegedly performed by Braun at Five Boro on July 14, 2005.  On that same date, Braun _also_ allegedly performed six diagnostic interview examinations, one 45-50 minute psychotherapy session, and six record review and evaluations – all of which were billed by the Defendants through Five Boro to GEICO.

(iii)   The Defendants billed for sixteen (16) hours of psychological testing allegedly performed by Dougherty at All Boro on January 7, 2010.  On that same date, Dougherty _also_ allegedly performed eight diagnostic interview examinations, and eight record review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.

(iv)    The Defendants billed for fifteen (15) hours of psychological testing allegedly performed by Braun at All Boro on January 20, 2010.  On that same date, Braun _also_ allegedly performed seven diagnostic interview examinations, and seven record review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.

(v)     The Defendants billed for seventeen (17) hours of psychological testing allegedly performed by Dougherty at All Boro on April 14, 2010.  On that same date, Dougherty _also_ allegedly performed four diagnostic interview examinations, and four record review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.

(vi)    The Defendants billed for fifteen (15) hours of psychological testing allegedly performed by Bonaparte at All Boro on May 10, 2010.  On that same date, Bonaparte _also_ allegedly performed seven diagnostic interview examinations, and seven record review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.

(vii)   The Defendants billed for twenty (20) hours of psychological testing allegedly performed by Braun at All Boro on May 21, 2010.  On that same date, Braun _also_ allegedly performed seven diagnostic interview examinations, and seven record

review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.

(viii)   The Defendants billed for fifteen (15) hours of psychological testing allegedly performed by Braun at Five Boro PLLC on June 1, 2010.  On that same date, Braun <u>also</u> allegedly performed three diagnostic interview examinations, and three record review and evaluations – all of which were billed by the Defendants through Five Boro PLLC to GEICO.  Furthermore, on that same date, Braun <u>also</u> allegedly performed an <u>additional</u> two 45-50 minute psychotherapy sessions at All Boro, which the Defendants also billed to GEICO.

(ix)   The Defendants billed for twenty (20) hours of psychological testing allegedly performed by Braun at Five Boro PLLC on June 4, 2010.  On that same date, Braun <u>also</u> allegedly performed four diagnostic interview examinations, and four record review and evaluations – all of which were billed by the Defendants through Five Boro PLLC to GEICO.

(x)   The Defendants billed for twenty-five (25) hours of psychological testing allegedly performed by Bonaparte at Five Boro PLLC on June 7, 2010.  On that same date, Bonaparte <u>also</u> allegedly performed five diagnostic interview examinations, and five record review and evaluations – all of which were billed by the Defendants through Five Boro PLLC to GEICO.

(xi)   The Defendants billed for twenty (20) hours of psychological testing allegedly performed by Mendelsohn at Five Boro PLLC on June 8, 2010.  On that same date, Mendelsohn <u>also</u> allegedly performed four diagnostic interview examinations, and four record review and evaluations – all of which were billed by the Defendants through Five Boro PLLC to GEICO.  Furthermore, on that same date, Mendelsohn <u>also</u> allegedly performed an <u>additional</u> two 45-50 minute psychotherapy sessions at All Boro, which the Defendants also billed to GEICO.

(xii)   The Defendants billed for fifteen (15) hours of psychological testing allegedly performed by Mendelsohn at Five Boro PLLC on June 9, 2010.  On that same date, Mendelsohn <u>also</u> allegedly performed three diagnostic interview examinations, three record review and evaluations, and three 45-50 minute psychotherapy sessions – all of which were billed by the Defendants through Five Boro PLLC to GEICO.

(xiii)   The Defendants billed for twenty-five (25) hours of psychological testing allegedly performed by Dougherty at Five Boro PLLC on June 14, 2010.  On that same date, Dougherty <u>also</u> allegedly performed five diagnostic interview examinations, and five record review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.  Furthermore, on that same date, Dougherty <u>also</u> allegedly performed an <u>additional</u> 45-50 minute psychotherapy session at All Boro, which the Defendants also billed to GEICO.

(xiv)   The Defendants billed for twenty (20) hours of psychological testing allegedly performed by Bonaparte at Five Boro PLLC on June 14, 2010.  On that same date, Bonaparte <u>also</u> allegedly performed four diagnostic interview examinations, and four record review and evaluations – all of which were billed by the Defendants through All Boro to GEICO.

(xv)   The Defendants billed for thirty (30) hours of psychological testing allegedly performed by Braun at Five Boro PLLC on October 27, 2010.  On that same date, Braun <u>also</u> allegedly performed six diagnostic interview examinations, and six record review and evaluations – all of which were billed by the Defendants through Five Boro PLLC to GEICO.

(xvi)   The Defendants billed for twenty-three (23) hours of psychological testing allegedly performed by Bonaparte at Five Boro on June 13, 2011.  On that same date, Bonaparte <u>also</u> allegedly performed seven diagnostic interview examinations, seven record review and evaluations, and one 45-50 minute psychotherapy session – all of which were billed by the Defendants through Five Boro to GEICO.

(xvii)   The Defendants billed for twenty (20) hours of psychological testing allegedly performed by Margulis at Five Boro PLLC on September 8, 2011.  On that same date, Margulis <u>also</u> allegedly performed four diagnostic interview examinations, four record review and evaluations, and two 45-50 minute psychotherapy session – all of which were billed by the Defendants through Five Boro PLLC to GEICO.

(xviii)  The Defendants billed for twenty (20) hours of psychological testing allegedly performed by Margulis at Five Boro PLLC on September 14, 2011.  On that same date, Margulis <u>also</u> allegedly performed four diagnostic interview examinations and four record review and evaluations – all of which were billed by the Defendants through Five Boro PLLC to GEICO.

66.   The Defendants' charges for the psychological testing also were fraudulent in that they routinely falsely represented that the psychologists who purportedly administered the testing prepared genuine, written reports interpreting the test results.  Specifically, according to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT codes 96100 or 96101 represents that the treating psychologist has prepared a written report interpreting the psychological test results.

67.     Though the Defendants routinely submitted billing for the psychological tests under CPT codes 96100 or 96101, and what purported to be interpretive test reports in support of their billing, neither the Treating Defendants, Former Treating Defendants, Braun, nor any other psychologists associated with the Former PC Defendants ever prepared any genuine written reports interpreting the test results.

68.     Rather, Grinberg and O. Grinberg – with the consent of Braun, the Treating Defendants, and the Former Treating Defendants – simply cobbled the psychological testing reports together using boilerplate language from pre-existing reports, without any interpretive input from the Treating Defendants, Former Treating Defendants, Braun, or any other psychologists.  Then, the Treating Defendants, Former Treating Defendants, Braun, or other psychologists associated with the Former PC Defendants affixed their signatures to the reports, or permitted Grinberg and O. Grinberg to "sign" the reports using a signature stamp they provided, without reviewing them.

69.     Virtually every psychological testing report submitted by the Defendants in support of the Former PC Defendants' billing contained language that was duplicated across many other reports.  Only the Insureds' respective background information and "psychological test" scores were unique to any particular patient.  By contrast, in almost every case, the stated purpose of the "tests," the rationale for using specific test instruments, the respective Insureds' attitudes toward test taking, and the resulting diagnoses consisted of boilerplate language that was cut-and-pasted from one Insured's testing report into the reports of many other Insureds.

70.     For instance, large numbers of purported psychological testing reports submitted by the Defendants through the Former PC Defendants included much if not all of the following, identical language – including identical, idiosyncratic grammar and punctuation as noted:

(i)     "The following psychological test instruments were used to assess the subject's personality and psychopathology:  BDI, BHS, BAI, Mental Status Examination, P-3, PDS.  This combination of tests was chosen in order to expedite the initial assessment, thereby improving the quality of care . . . ."

(ii)    "Pertinent for the psychological evaluation of the patient's injuries reside in the following include [sic]:  1. Does the patient have a problem, which lies within the field of psychiatry and, if so, what kind of problem is it and was it the result of the injury?  2. Is there any clinical basis for the assignment of causation for the subject's injuries?  3. Did the condition render the subject disabled at any time?  4. Has the patient been in need of psychiatric medical treatment, or will the patient be in need of psychiatric medical treatment in the future as a result of the injury?  5. Is the patient's condition permanent and stationary?"

(iii)   "Rational [sic] for utilizing specific testing instruments:  1. Beck Depression Inventory (BDI).  The Beck Depression Inventory was designed to assess the severity of depression in psychiatrically diagnosed patients, and has been used as a screening instrument to detect the presence and severity of depression, 2. Beck Anxiety Inventory (BAI).  The Beck Anxiety Inventory attempts to evaluate the degree to which various responses to stress are effecting the patient.  It consists of groups of statements that address twenty-one measures of anxiety, 3. Neuro-Psychological Symptom Check list (NSC).  Quick screening instrument to assess presence of neuropsychological symptoms.  It addresses both global impairment, cognitive status and specific symptom areas eliciting diagnostically relevant information, 4. Beck Hopelessness Inventory (BHS).  This test is designed to evaluate the individuals [sic] perception of their future in terms of the degree of hope for their life to change for the better, 5, [sic] The Posttraumatic Stress Diagnostic Scale (PDS) is designed to aid in the diagnosis of Posttraumatic Stress Disorder based on DSM-IV criteria.  The individual's Symptom Severity Score, Number of Symptoms Endorsed and Symptom Severity Rating [sic], 6. Patient Pain Profile (P-3).  The P-3 is intended to serve numerous health care specialists, including physicians, psychologists, chiropractors, and physical therapists to help assess patient's [sic] perception of pain."

(iv)    "Attitude toward Test Taking . . . [Name of Patient] was a willing and cooperative subject.  The test scores appear to reflect an appropriate level of effort and can be potentially relied upon in the overall assessment of functioning."

(v)     "Results of the testing are consistent with conclusion of initial interview. Regarding the contribution of any historical factors, they are playing no role in the patient's present psychiatric condition."

(vi)    "In evaluating the patient's subjective complaints it can be said the patient is credible and convincing.  The test findings and clinical assessment indicate the patient Does [sic] not appear to be exaggerating or malingering[.]"

22

A representative sample of the Defendants' fraudulent psychological test reports containing this identical, boilerplate language is annexed hereto as Exhibit "5."

71.     It is clear that the Defendants drew from a "stock" of language from pre-existing psychological testing reports that they randomly assembled and combined with the Insureds' claim information to create the impression that the "psychological testing" sessions actually were properly performed.  In fact, they either were not performed at all or were not meant to have any benefit for the Insureds that were subjected to them, and were only conducted for the financial benefit of the Defendants.

72.     Virtually every boilerplate "psychological test report" generated by the Defendants concluded with a false, pre-determined "diagnosis" of "adjustment disorder" with or without "anxiety" and/or "depressed mood," purportedly as the result of trauma incurred during an automobile accident.  The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentment.  In actuality, the Insureds did not suffer from "adjustment disorder" or any other legitimate psychological problems as the result of the minor automobile accidents they supposedly experienced.

73.     According to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition (the "DSM-IV"), which is published by the American Psychiatric Association and provides a common language and standardized criteria for the classification of mental disorders, a diagnosis of "adjustment disorder" requires – among other things – the "development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s)," and likewise requires that the patient exhibit "marked distress that is in excess of what would be expected from exposure to the stressor" or "significant impairment in social or occupational (academic) functioning."

74.     Where an "adjustment disorder" diagnosis includes the "depressed mood" subspecification, the patient must manifest symptoms such as depressed mood, tearfulness, or feelings of hopelessness.

75.     Where an "adjustment disorder" diagnosis includes the "anxiety" subspecification, the patient must manifest symptoms such as nervousness, worry, or jitteriness.

76.     In virtually every claim for No-Fault Benefits submitted by the Defendants through the Former PC Defendants, the Insured allegedly was involved in a very minor accident involving a low-speed rear-end collision or a side-swipe.  Most of the Insureds did not go to the hospital following the alleged accidents, and the minority of Insureds who did go to the hospital were in virtually every case briefly observed on an outpatient basis and sent on their way after an hour or two.  These trivial "fender-benders" did not induce any form of "adjustment disorder" in the Insureds who purportedly experienced them.

77.     In fact, these purported diagnoses were rendered solely to support additional charges to GEICO for unnecessary psychological and medical services provided through the Former PC Defendants and the Clinics.

78.     The Defendants' purported use of psychological tests – to the extent that they actually provided the tests in the first instance – stands in marked contrast to the standard of care in basic, legitimate psychological practice.  For instance:

    (i)     The Defendants virtually always purported to provide the psychological tests on the first date when the Insureds supposedly presented to the Former PC Defendants for treatment, often within days or a few weeks of the accident.  Self-reporting psychological tests, however, generally should not be administered unless and until a psychologist assesses a patient over a period of time to determine the patient's psychological functioning.

    (ii)    Under generally accepted standards and practices, a diagnostic interview examination alone should be sufficiently comprehensive to address all of the issues discernable from the types of self-reporting psychological tests that the

Defendants purported to provide.  Psychological testing of the kind allegedly administered by the Defendants is only medically necessary when a diagnosis is not evident from a diagnostic interview and the psychological testing will yield relevant additional clinical data beyond that obtained through the diagnostic interview – a circumstance that cannot be established prior to the administration of the diagnostic interview.

(iii)   The Defendants virtually always purported to provide the psychological tests to Insureds before they conducted any actual diagnostic interview of the Insureds solely because it enabled them to bill for an expensive set of medically and psychologically useless tests.

(iv)   The Defendants did not employ a sufficient number of tests to yield the diagnoses contained in their reports – the majority of the tests administered under the direction of the Defendants were "subjective" self-reporting questionnaires that merely reported symptoms or complaints of the Insureds, and did not provide sufficient data for any objective psychological assessment of the Insureds.

79.   Not only did the Defendants deliberately bill for medically and psychologically unnecessary psychological testing that in many cases never was performed in the first instance, they also unbundled the tests in order to maximize the fraudulent charges that they could submit, or cause to be submitted, to GEICO.

80.   Specifically, when submitting their billing for the psychological testing, the Defendants virtually always submitted a separate charge of $103.31 under CPT code 90887 for the "interpretation or explanation" of the results of the psychological testing to the Insureds' family or other responsible persons.  Neither the Treating Defendants, Former Treating Defendants, Braun, nor any other psychologists associated with the Former PC Defendants, however, ever interpreted or explained the test results to the Insureds' family members or other responsible persons.  Even if they did, the charges for such "interpretation and explanation" would be part and parcel of the charges that the Defendants submitted for the tests under CPT codes 96100 and 96101.

2. **The Fraudulent "Diagnostic Interview Examination" and "Record Evaluation" Charges**

81.     After the Defendants purported to provide Insureds with the psychological tests, they purported to provide virtually every Insured with an initial "diagnostic interview examination."  In most cases, one of the Treating Defendants, Former Treating Defendants, or Braun purported to perform the diagnostic interview examinations.

82.     The diagnostic interview examination then was billed to GEICO under CPT code 90801, resulting in a charge of $194.58, separate and independent of the other psychological services that the Insured purportedly received.

83.     Like the psychological testing, the diagnostic interview examinations were fraudulent inasmuch as they were medically and psychologically unnecessary, and were conducted, to the extent that they are conducted at all, solely pursuant to the kickback arrangements between the Former PC Defendants, Grinberg, O. Grinberg, and the clinics, and not pursuant to the documented and clinically reasonable needs of the Insureds.

84.     Even so, in the phony diagnostic interview examination reports that the Defendants submitted in support of their fraudulent billing for virtually every Insured, the Defendants virtually always reiterated their ersatz, boilerplate "diagnosis" of "adjustment disorder" with or without "anxiety" and/or "depressed mood," purportedly as the result of trauma incurred during an automobile accident.

85.     Much like the phony, boilerplate psychological testing reports that the Defendants submitted in support of their billing, virtually every diagnostic interview examination report submitted by the Defendants contained language that was duplicated across many other reports. Only the Insureds' respective background information and "psychological test" scores – which the Defendants imported from the psychological testing reports – were unique to any particular

patient. By contrast, in almost every case, the stated purpose of the "examinations," the "diagnosis," the "recommendations/goals," the "prognosis," the treatment "termination criteria," and the "conclusions" consisted of boilerplate language that was cut-and-pasted from one Insured's testing report into the reports of many other Insureds.

86. For instance, large numbers of purported diagnostic interview examination reports submitted by the Defendants through the Former PC Defendants included much if not all of the following, identical language – including identical, idiosyncratic grammar and punctuation as noted:

(i) "Rationale/purpose: . . . Patient was given a psychosocial symptom checklist by [his/her] primary specialist and responded to symptoms of a psychosocial nature that [he/she] states were not present before the injury . . . . Initial Examination performed by primary doctor also revealed that the patient experiences distress related to the accident. There appears [sic] to be limitations in [Name of Insured's] functioning and they may be adversely affecting [his/her] psychological and emotional well being. Therefore, the primary physician requested additional psychological information on this patient to provide more appropriate care. The purpose of this evaluation was to target a differential diagnosis and to design a treatment intervention regiment if there is an indication for further care."

(ii) "RECOMMENDATIONS/GOALS . . . Chosen treatment modality: Brief outpatient psychotherapy. Psychotherapeutic intervention can lessen the duration and the severity of the resulting emotional disturbance. Rational [sic] for chosen modalities: Severity of illness Criteria [sic] for Brief [sic] outpatient psychotherapy. (1) The patient demonstrates adequate judgment and can assume responsibility for behavioral change., [sic] Brief outpatient psychotherapy. (2) The patient can identify with the therapist one focal conflict to be the main therapeutic issue. Intensity of Service Criteria for Brief Psychotherapy-The patient requires not more than 8 sessions of treatment to address the focal problem . . . Recommended treatment schedule: 1/week. Medications: No psychotropic medications are prescribed at this time."

(iii) "Specific intervention goals for [Name of Insured] include: . . . Adjustment Disorder: Reduce overall level frequency and intensity of the anxiety so that daily functioning is not impaired, Stabilizing [sic] the crisis and creating, to the extend [sic] possible, a secure baseline from which to address disorder symptoms, Explore [sic] the impact of trauma on the life and focus on problem solving and social skills acquisition in supportive context."

27

(iv)  "PROGNOSIS: . . . According to facts stated above prognosis is [excellent/good], but definitely existence of severity of [physical trauma and functional disability, health problems, problems in interpersonal relationships, decrease in level of daily living activities] makes recovery slower.  Still a progress that is made [sic] during the time of initial phase of the multidisciplinary treatment gives me an opportunity to look at [sic] the client's improvement.  Functional recovery is expected within:  [can not be determined at this time/2-3 months]."

(v)  "TERMINATION CRITERIA:  [(1) Improved sleep, (2) No irritability symptoms for 30 days that result in adverse consequences, (3) Elimination of phobia and posttraumatic symptoms, (4) Global Assessment of Functioning score of 85 will determine termination of therapy with a follow-up session scheduled 2 months later.]"

(vi)  "CONCLUSIONS: . . . [Name of Insured] seems to have responded to physical injury with [mild/moderate/severe] anxiety level[, mild/moderate depression level].  Such a reaction is typical of patient's [sic] who have undergone a recent trauma in which there is combination [sic] of psychological distress and physical injury.  There are obvious signs of [adjustment disorder with or without anxiety or depression] presented."

A representative sample of the Defendants fraudulent diagnostic interview examination reports containing this identical, boilerplate language is annexed hereto as Exhibit "6."

87.  As with the ersatz psychological testing reports they compiled, it is clear that the Defendants drew from a "stock" of language from pre-existing diagnostic interview examination reports that they randomly assembled and combined with the Insureds' claim information to create the impression that the "diagnostic interview examinations" actually were properly performed.  In fact, they either were not performed at all, or were not meant to have any benefit for the Insureds that were subjected to them, and were only conducted for the financial benefit of the Defendants.

88.  Not only did the Defendants submit fraudulent billing for the diagnostic interview examinations, they also "unbundled" the charges in virtually every instance in order to maximize the fraudulent billing they could submit, or cause to be submitted, to GEICO.

89.     For instance, for virtually every Insured, on the same dates that they submitted charges for the diagnostic interview examinations, the Defendants submitted separate charges of $67.24 under CPT code 90885.  The use of CPT code 90885 represents that a psychologist conducted "psychiatric evaluation of hospital records, other psychiatric reports, psychometric and/or projective tests, and other accumulated data for medical diagnostic purposes." The Defendants submitted these charges despite the fact that review and evaluation of the Insureds' medical and psychological records was necessary to, and already was reimbursed as an element of, the Insureds' diagnostic interview examinations.  In other words, healthcare providers cannot conduct and bill for a diagnostic interview examination, then bill separately for contemporaneously-provided medical or psychological record reviews.

90.     Furthermore, the Defendants' charges under CPT code 90885 for record review and evaluation were fraudulent inasmuch as no psychologist associated with the Former PC Defendants ever reviewed or evaluated any records to support the charges.

### 3.     The Fraudulent Psychotherapy Charges

91.     Based upon the fraudulent, pre-determined outcome of the psychological testing and diagnostic interview examinations, and the phony "adjustment disorder with anxiety/depression" diagnoses, the Defendants purportedly provided most Insureds with two-to-four psychotherapy sessions, typically over the course of several months. In most cases, one of the Treating Defendants, Former Treating Defendants, or Braun purported to perform the psychotherapy.

92.     These psychotherapy sessions then were billed to GEICO under CPT code 90806, resulting in a charge of $120.10 per Insured, per session.

93.     Like the Defendants' charges for the psychological testing and diagnostic interview examinations, the Defendants' charges for the psychotherapy were fraudulent in that it was medically and psychologically unnecessary, and was conducted, to the extent that it was conducted at all, solely pursuant to the kickback arrangements between the Former PC Defendants, Grinberg, O. Grinberg, and the clinics – virtually every Insured who purportedly was subjected to the psychotherapy did not have any actual psychological complaints arising from automobile accidents.

94.     The Defendants' charges for the psychotherapy sessions also were fraudulent because – according to the Fee Schedule – the use of CPT code 90806 requires that the psychologist spend between 45-50 minutes face-to-face with the Insured.  The Defendants' use of CPT code 90806 with respect to the psychotherapy sessions materially misrepresented and exaggerated the level of services that were provided, in that neither the Treating Defendants, Former Treating Defendants, Braun, nor any other psychologists associated with the Former PC Defendants spent 45-50 minutes with the Insureds.  Rather, the psychotherapy sessions virtually never lasted more than 10-15 minutes, to the extent that they were conducted at all.

### D.     The Fraudulent Billing for Independent Contractor Services

95.     The Defendants' fraudulent scheme included submission of billing to GEICO seeking payment for services provided by independent contractors.  Under the No-Fault Laws, professional corporations are ineligible to bill or receive payment for services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or their employees.

96.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive

reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("[W]here the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services . . . ."); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in February 21, 2001 Opinion Letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act . . . ."); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS). (Copies of these Opinion Letters are collectively annexed hereto as Exhibit "7.")

97.     Not only did the Defendants routinely bill for medically and psychologically useless services that are performed pursuant to kickbacks to the Clinics and according to a pre-determined, fraudulent treatment protocol, but they also routinely billed for services that were performed by independent contractors, rather than by the Former PC Defendants' employees.

98.     Braun is, and always has been, the only psychologist employed by the Former PC Defendants.

99.     The majority of psychological services billed to GEICO through the Former PC Defendants were not performed by Braun, but rather were performed – to the extent that they

were performed at all – by the Treating Defendants, the Former Treating Defendants, or by other psychologists.

100.    The Treating Defendants, Former Treating Defendants, and every other psychologist who purported to perform services through the Former PC Defendants were treated by the Former PC Defendants, Grinberg, O. Grinberg, and Braun as independent contractors.

101.    Even so, in the billing that they submitted or caused to be submitted to GEICO through the Former PC Defendants, the Former PC Defendants, Grinberg, O. Grinberg, and Braun routinely misrepresented the Treating Defendants, Former Treating Defendants, and psychologists other than Braun who purported to perform services through the Former PC Defendants as the Former PC Defendants' employees.

102.    In actuality, the Former PC Defendants, Grinberg, O. Grinberg, and Braun treated the Treating Defendants, Former Treating Defendants, and every other psychologist who purported to perform services through the Former PC Defendants as independent contractors in an effort to avoid paying taxes, worker's compensation, and meeting other legal obligations.  For instance, the Defendants:

   (i)     paid the Treating Defendants, Former Treating Defendants, and other psychologists, either in whole or in part, on a 1099 basis rather than a W-2 basis;

   (ii)    established an understanding with the Treating Defendants, Former Treating Defendants, and other psychologists that they are independent contractors, rather than employees;

   (iii)   paid no employee benefits to the Treating Defendants, Former Treating Defendants, and other psychologists;

   (iv)    failed to secure and maintain W-4 or I-9 forms for the Treating Defendants, Former Treating Defendants, and other psychologists;

   (v)     failed to withhold federal, state, or city taxes on behalf of the Treating Defendants, Former Treating Defendants, and other psychologists;

(vi)     compelled the Treating Defendants, Former Treating Defendants, and other psychologists to pay for their own malpractice insurance at their own expense;

(vii)    permitted the Treating Defendants, Former Treating Defendants, and other psychologists to set their own schedules and days on which they desire to perform services;

(viii)   permitted the Treating Defendants, Former Treating Defendants, and other psychologists to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other psychological practices;

(ix)     failed to cover the Treating Defendants, Former Treating Defendants, and other psychologists for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the Treating Defendants, Former Treating Defendants, and other psychologists are independent contractors.

103.    By electing to treat the Treating Defendants, Former Treating Defendants, and other psychologists as independent contractors, Grinberg, O. Grinberg, Braun, and the Former PC Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)     avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)    avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)     avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)     avoiding claims of agency-based liability arising from work performed by the Treating Defendants, Former Treating Defendants, and other psychologists.

104.    Because the Treating Defendants, Former Treating Defendants, and other psychologists who supposedly performed the services that were billed to GEICO through the

Former PC Defendants are independent contractors, the Former PC Defendants do not have, and never had, any right to bill for or collect No-Fault Benefits in connection with those services.

105.    Even so, the Defendants bill for the psychological services as if they are provided by actual employees of the Former PC Defendants to make it appear as if the services are eligible for reimbursement, when in fact they are not.  The Defendants' misrepresentations and omissions in the billing are consciously designed to mislead GEICO into believing that it is obligated to pay the Former PC Defendants, when in fact GEICO is not.

## III.    The Defendants' Submission of Fraudulent NF-3 Forms and Treatment Records to GEICO

106.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 Forms) and treatment records consistently have been submitted to GEICO by the Defendants and on behalf of the Former PC Defendants seeking payment for services for which the Former PC Defendants are ineligible to receive payment.

107.    The NF-3 forms and treatment records submitted to GEICO by the Defendants and on behalf of the Former PC Defendants were false and misleading in the following material respects:

(i)    The NF-3 forms and treatment records uniformly misrepresented to GEICO that the Former PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). However, the Former PC Defendants were not properly licensed because they were unlawfully incorporated or organized and were owned, controlled, and utilized by Grinberg, who was not a psychologist, and O. Grinberg, who was not a psychologist or social worker, for their sole economic benefit in contravention of New York law.

(ii)    The NF-3 forms uniformly misrepresented to GEICO that the Former PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). However, the Former PC Defendants were not properly licensed in that they were psychology professional corporations and a professional limited

34

liability company that engaged in unlawful fee splitting with Grinberg, O. Grinberg, and the Clinics.

(iii)     The NF-3 forms uniformly misrepresented to GEICO that the Former PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the Former PC Defendants were not properly licensed in that they were psychology professional corporations that unlawfully paid kickbacks to the Clinics for their patient referrals.

(iv)     The NF-3 forms uniformly misrepresented to GEICO that the pertinent psychological services actually were performed, and that the pertinent psychological services were medically or psychologically necessary.  In fact, the psychological services frequently were not performed at all and, to the extent that they were performed, they were not medically or psychologically necessary were are performed pursuant to kickbacks that the Former PC Defendants, Grinberg, and O. Grinberg provided to the clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

(v)     With the exception of NF-3 forms covering services allegedly provided by Braun, the NF-3 forms uniformly misrepresented to GEICO that the Former PC Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that were supposedly performed. However, the Former PC Defendants were not eligible to seek or pursue collection of No-Fault Benefits associated with services not alleged to have been provided by Braun because the services were not provided by the Former PC Defendants' employees.

## IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

108.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

109.    To induce GEICO to promptly pay the fraudulent charges for the fraudulent psychological services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

110.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the Former PC Defendants in an effort to prevent discovery that these professional corporations were unlawfully incorporated, owned, and controlled by non-psychologists/non-

35

social workers and engaged in illegal fee splitting, and therefore were ineligible to bill for or collect No-Fault Benefits.

111.    Also, in every bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the Former PC Defendants were lawfully licensed and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

112.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that Former PC Defendants derived their patient referrals through kickbacks that Grinberg, O. Grinberg, and the Former PC Defendants provided to the Clinics. Indeed, the Defendants entered into complex financial arrangements with the Clinics that were designed to, and did, conceal the nature of the kickbacks.

113.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the psychology services were medically and psychologically unnecessary and were performed – to the extent that they were performed at all –pursuant to a fraudulent, pre-determined protocol designed to maximize the charges that could be submitted.

114.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the psychology services frequently never were performed in the first instance.

115.    Moreover, the Defendants knowingly misrepresented and concealed facts related to the employment status of the Treating Defendants, Former Treating Defendants, and psychologists other than Braun who were associated with the Former PC Defendants in order to prevent GEICO from discovering that the Treating Defendants, Former Treating Defendants, and other psychologists were not employed by the Former PC Defendants.

116.    What is more, the Defendants created and have purported to practice through multiple professional corporations with different tax identification numbers in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

117.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers.  These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

118.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within thirty days.  The facially-valid, verified documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them.  As a result, GEICO has incurred damages of more than $2,096,000.00 dollars based upon payments made by GEICO in reliance on the fraudulent charges that the Defendants submitted or caused to be submitted.

119.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against Grinberg and O. Grinberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

120.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 119 above.

37

121.     Five Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

122.     Grinberg and O. Grinberg knowingly conducted and/or participated, directly or indirectly, in the conduct of Five Boro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for almost seven years seeking payments that Five Boro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-psychologists; (ii) it engaged in fee splitting with non-psychologists; (iii) the billed-for services were performed pursuant to kickbacks provided to the Clinics; (iv) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) in many cases, the billed-for services were not performed at all; and (vi) the billed-for services were provided by independent contractors, not by Five Boro employees.  A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

123.     Five Boro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Grinberg and O. Grinberg operated Five Boro, insofar as Five Boro has never been eligible to bill for or collect No-Fault Benefits nor has it engaged in any legitimate psychological practice, and acts of mail fraud therefore are essential in order for Five Boro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts

of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Five Boro to the present day. In addition, Five Boro is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it was fraudulently incorporated, owned and controlled by non-psychologists, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.

124.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $729,000.00 pursuant to the fraudulent bills submitted by Grinberg and O. Grinberg through Five Boro.

125.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SECOND CAUSE OF ACTION
### Against Grinberg, O. Grinberg, and Dougherty
### (Violation of RICO, 18 U.S.C. § 1962(d))

126.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 125 above.

127.    Five Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

128.    Grinberg, O. Grinberg, and Dougherty are employed by and/or associated with the Five Boro enterprise.

129.    Grinberg, O. Grinberg, and Dougherty knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Five Boro

enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills, on a continuous basis for almost seven years, seeking payment for psychology services that Five Boro was not eligible to receive under the No-Fault Laws because:  (i) it was unlawfully incorporated and owned and controlled by non-psychologists; (ii) it engaged in fee splitting with non-psychologists; (iii) the billed-for services were performed pursuant to kickbacks provided to the Clinics; (iv) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) in many cases, the billed-for services were not performed at all; and (vi) the billed-for services were provided by independent contractors, not by Five Boro employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."  Each such mailing was made in furtherance of the mail fraud scheme.

130.    Grinberg, O. Grinberg, and Dougherty knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

131.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $729,000.00 dollars pursuant to the fraudulent bills submitted by the Defendants through Five Boro.

132.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against Grinberg and O. Grinberg**
**(Common Law Fraud)**

133.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 132 above.

134.    Grinberg and O. Grinberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Five Boro seeking payment for psychological services.

135.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that Five Boro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro was not properly licensed in that it was fraudulently incorporated and actually owned and controlled by non-psychologists Grinberg and O. Grinberg;

(ii)    In every claim, the representation that Five Boro was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro was not properly licensed in that it engages in illegal fee-splitting with non-psychologists Grinberg, O. Grinberg, and the Clinics;

(iii)   In every claim, the representation that Five Boro was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro was not properly licensed in that it was a psychology professional corporation that unlawfully paid kickbacks to the Clinics for its patient referrals.

(ix)    In every claim, the representation that the pertinent psychological services were medically or psychologically necessary, when in fact the psychological services

frequently were not performed at all and, to the extent that they were performed, they were not medically or psychologically necessary and were performed pursuant to kickbacks that the Former PC Defendants, Grinberg, and O. Grinberg provided to the Clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

(x)     In every claim for services provided by psychologists other than Braun, the representation that Five Boro was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that were performed, when in fact Five Boro was not eligible to seek or pursue collection of No-Fault Benefits associated with services not alleged to have been provided by Braun because the services were not provided by the Five Boro's employees.

136.    Grinberg and O. Grinberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Five Boro that were not compensable under the No-Fault Laws.

137.    GEICO justifiably relied on Grinberg's and O. Grinberg's false and fraudulent representations, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $729,000.00 pursuant to the fraudulent bills submitted by Grinberg and O. Grinberg through Five Boro.

138.    Grinberg's and O. Grinberg's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

139.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

42

**FOURTH CAUSE OF ACTION**
**Against Dougherty**
**(Aiding and Abetting Fraud)**

140.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 above.

141.     Dougherty knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Grinberg and O. Grinberg through Five Boro.  The acts of Dougherty in furtherance of the fraudulent scheme include: (i) knowingly performing medically unnecessary psychological services in exchange for payment of money from Five Boro, Grinberg, and O. Grinberg; (ii) knowingly issuing fraudulent reports in exchange for payment of money from Five Boro, Grinberg, and O. Grinberg; and (iii) knowingly causing fraudulent billing to be issued in exchange for payment of money from Five Boro, Grinberg, and O. Grinberg.

142.     The conduct of Dougherty in furtherance of the fraudulent scheme was significant and material.  The conduct of Dougherty was a necessary part of and was critical to the success of the fraudulent scheme because without her actions, including the performance of the fraudulent psychological services, issuance of the fraudulent reports, and participation in the fraudulent billing, there would be no opportunity for Five Boro, Grinberg, and O. Grinberg to obtain payment from GEICO and from other insurers.

143.     Dougherty aided and abetted the fraudulent scheme in a calculated effort to induce GEICO to pay charges to Five Boro for medically unnecessary services or illusory services that were not compensable under New York's No-Fault Laws, because she sought to continue profiting through the fraudulent scheme.

43

144.    The conduct of Dougherty caused GEICO to pay more than $729,000.00 based upon the fraudulent charges submitted through Five Boro.

145.    Dougherty's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

146.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Grinberg, O. Grinberg, and Dougherty**
**(Unjust Enrichment)**

147.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 146 above.

148.    As set forth above, Grinberg, O. Grinberg, and Dougherty have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

149.    When GEICO paid the bills and charges submitted by or on behalf of Five Boro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Grinberg's, O. Grinberg's, and Dougherty's improper, unlawful, and/or unjust acts.

150.    Grinberg, O. Grinberg, and Dougherty have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Grinberg, O. Grinberg, and Dougherty voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

151.    Grinberg's, O. Grinberg's, and Dougherty's retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

152.    By reason of the above, Grinberg, O. Grinberg, and Dougherty have been unjustly enriched in an amount to be determined at trial, but in no event less than $729,000.00.

44

**SIXTH CAUSE OF ACTION**
**Against Grinberg and O. Grinberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

153.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 152 above.

154.    All Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

155.    Grinberg and O. Grinberg knowingly has conducted and/or participated, directly or indirectly, in the conduct of All Boro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than four years seeking payments that All Boro was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by non-psychologists; (ii) it engaged in fee splitting with non-psychologists; (iii) the billed-for services were performed pursuant to kickbacks provided to the Clinics; (iv) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) in many cases, the billed-for services were not performed at all; and (vi) the billed-for services were provided by independent contractors, not by All Boro employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

156.    All Boro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the

45

regular way in which Grinberg and O. Grinberg operated All Boro, insofar as All Boro has never been eligible to bill for or collect No-Fault Benefits nor has it engaged in any legitimate psychological practice, and acts of mail fraud therefore were essential in order for All Boro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through All Boro to the present day. In addition, All Boro is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it was fraudulently incorporated, owned and controlled by a non-psychologist, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.

157.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,249,000.00 pursuant to the fraudulent bills submitted by Grinberg and O. Grinberg through All Boro.

158.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Grinberg, O. Grinberg, Dougherty, and**
**Bonaparte**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

159.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 158 above.

160.    All Boro Psychological Services, P.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

161.    Grinberg, O. Grinberg, Dougherty, and Bonaparte are employed by and/or associated with the All Boro enterprise.

162.    Grinberg, O. Grinberg, Dougherty, and Bonaparte knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the All Boro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills, on a continuous basis for almost four years, seeking payment for psychology services that All Boro was not eligible to receive under the No-Fault Laws because:  (i) it was unlawfully incorporated and owned and controlled by non-psychologists; (ii) it engaged in fee splitting with non-psychologists; (iii) the billed-for services were performed pursuant to kickbacks provided to the Clinics; (iv) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) in many cases, the billed-for services were not performed at all; and (vi) the billed-for services were provided by independent contractors, not by All Boro employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."  Each such mailing was made in furtherance of the mail fraud scheme.

163.    Grinberg, O. Grinberg, Dougherty, and Bonaparte knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

47

164.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,249,000.00 dollars pursuant to the fraudulent bills submitted by the Defendants through All Boro.

165.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Grinberg and O. Grinberg**
**(Common Law Fraud)**

166.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 165 above.

167.    Grinberg and O. Grinberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through All Boro seeking payment for psychological services.

168.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that All Boro was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact All Boro was not properly licensed in that it was fraudulently incorporated and actually owned and controlled by non-psychologists Grinberg and O. Grinberg;

(ii)    In every claim, the representation that All Boro was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact All Boro was not properly licensed in that it engaged in illegal fee-splitting with non-psychologists Grinberg, O. Grinberg, and the Clinics;

(iii)   In every claim, the representation that All Boro was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact All Boro was not properly licensed in that it was a psychology professional corporation that unlawfully paid kickbacks to the Clinics for its patient referrals.

(iv)     In every claim, the representation that the pertinent psychological services were medically or psychologically necessary, when in fact the psychological services frequently were not performed at all and, to the extent that they were performed, they were not medically or psychologically necessary and were performed pursuant to kickbacks that the Former PC Defendants, Grinberg, and O. Grinberg provide to the Clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

(v)     In every claim for services provided by psychologists other than Braun, the representation that All Boro was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that were performed, when in fact All Boro was not eligible to seek or pursue collection of No-Fault Benefits associated with services not alleged to have been provided by Braun because the services were not provided by All Boro's employees.

169.     Grinberg and O. Grinberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through All Boro that were not compensable under the No-Fault Laws.

170.     GEICO justifiably relied on Grinberg's and O. Grinberg's false and fraudulent representations, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,249,000.00 pursuant to the fraudulent bills submitted by Grinberg and O. Grinberg through All Boro.

171.     Grinberg's and O.Grinberg's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

172.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
**Against Dougherty and Bonaparte**
**(Aiding and Abetting Fraud)**

173.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 172 above.

174.    Dougherty and Bonaparte knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Grinberg and O. Grinberg through All Boro.  The acts of Dougherty and Bonaparte in furtherance of the fraudulent scheme included:  (i) knowingly performing medically unnecessary psychological services in exchange for payment of money from All Boro, Grinberg, and O. Grinberg; (ii) knowingly issuing fraudulent reports in exchange for payment of money from All Boro, Grinberg, and O. Grinberg; and (iii) knowingly causing fraudulent billing to be issued in exchange for payment of money from All Boro, Grinberg, and O. Grinberg.

175.    The conduct of Dougherty and Bonaparte in furtherance of the fraudulent scheme was significant and material.  The conduct of Dougherty and Bonaparte was a necessary part of and was critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent psychological services, issuance of the fraudulent reports, and participation in the fraudulent billing, there would be no opportunity for All Boro, Grinberg, and O. Grinberg to obtain payment from GEICO and from other insurers.

176.    Dougherty and Bonaparte aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to All Boro for medically unnecessary services or illusory services that were not compensable under New York's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

177.     The conduct of Dougherty and Bonaparte caused GEICO to pay more than $1,249,000.00 based upon the fraudulent charges submitted through All Boro.

178.     Dougherty's and Bonaparte's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

179.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Grinberg, O. Grinberg, Dougherty,**
**and Bonaparte**
**(Unjust Enrichment)**

180.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 179 above.

181.     As set forth above, Grinberg, O. Grinberg, Dougherty, and Bonaparte have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

182.     When GEICO paid the bills and charges submitted by or on behalf of All Boro for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

183.     Grinberg, O. Grinberg, Dougherty, and Bonaparte have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that they voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

184.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

185.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,249,000.00.

### ELEVENTH CAUSE OF ACTION
**Against Grinberg  and O. Grinberg**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

186.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 185 above.

187.    Five Boro Psychological and Licensed Master Social Work Services P.L.L.C. is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

188.    Grinberg and O. Grinberg knowingly have conducted and/or participated, directly or indirectly, in the conduct of Five Boro PLLC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills on a continuous basis for more than 20 months seeking payments that Five Boro PLLC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully organized and owned and controlled, in part, by a non-social worker and non-psychologist; (ii) it engaged in fee splitting with non-psychologists/non-social workers; (iii) the billed-for services were performed pursuant to kickbacks provided to the Clinics; (iv) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) in many cases, the billed-for services were not performed at all; and (vi) the billed-for services were provided by independent contractors, not by Five Boro PLLC employees. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

189.    Five Boro PLLC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud were the regular way in which Grinberg and O. Grinberg operated Five Boro PLLC, insofar as Five Boro PLLC is not engaged in a legitimate psychological or social work practice, and acts of mail fraud therefore are essential in order for Five Boro PLLC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Five Boro PLLC to the present day. In addition, Five Boro PLLC is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it was fraudulently organized, owned and controlled by a non-psychologist/non-social worker, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State.

190.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,000.00 pursuant to the fraudulent bills submitted by Grinberg and O. Grinberg through Five Boro PLLC.

191.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Grinberg, O. Grinberg, Dougherty,**
**and Bonaparte**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

192.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 191 above.

193.    Five Boro Psychological and Licensed Master Social Work Services P.L.L.C.  is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

194.    Grinberg, O. Grinberg, Dougherty, and Bonaparte, are employed by and/or associated with the Five Boro PLLC enterprise.

195.    Grinberg, O. Grinberg, Dougherty, and Bonaparte knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Five Boro PLLC enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent bills, on a continuous basis for almost 20 months, seeking payment for psychology services that Five Boro PLLC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully organized and owned and controlled, in part, by a non-social worker and non-psychologist; (ii) it engaged in fee splitting with non-psychologists/non-social workers; (iii) the billed-for services were performed pursuant to kickbacks provided to the Clinics; (iv) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (v) in many cases, the billed-for services were not performed at all; and (vi) the billed-for services were provided by independent contractors, not by Five Boro PLLC employees. A representative sample of the

fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."  Each such mailing was made in furtherance of the mail fraud scheme.

196.    Grinberg, O. Grinberg, Dougherty, and Bonaparte knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

197.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $147,000.00 dollars pursuant to the fraudulent bills submitted by the Defendants through Five Boro PLLC.

198.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Grinberg and O. Grinberg**
**(Common Law Fraud)**

199.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 198 above.

200.    Grinberg and O. Grinberg intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills through Five Boro PLLC seeking payment for psychological services.

201.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)      In every claim, the representation that Five Boro PLLC was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro PLLC was not properly licensed in that it was fraudulently organized and actually owned and controlled, in part, by non-social worker O. Grinberg;

(ii)     In every claim, the representation that Five Boro PLLC was properly licensed and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro PLLC was not properly licensed in that it engaged in illegal fee-splitting with non-social workers O. Grinberg and the Clinics;

(iv)     In every claim, the representation that Five Boro PLLC was lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact Five Boro PLLC was not properly licensed in that it unlawfully paid kickbacks to the Clinics for its patient referrals.

(vi)     In every claim, the representation that the pertinent psychological services were medically or psychologically necessary, when in fact the psychological services frequently were not performed at all and, to the extent that they were performed, they were not medically or psychologically necessary and were performed pursuant to kickbacks that the Former PC Defendants, Grinberg, and O. Grinberg provide to the Clinics and pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants.

(vii)    In every claim for services provided by psychologists other than Braun, the representation that Five Boro PLLC was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that were performed, when in fact Five Boro PLLC was not eligible to seek or pursue collection of No-Fault Benefits associated with services not alleged to have been provided by Braun because the services were not provided by All Boro's employees.

202.    Grinberg and O. Grinberg intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Five Boro PLLC that were not compensable under the No-Fault Laws.

203.    GEICO justifiably relied on Grinberg's and O. Grinberg's false and fraudulent representations, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $149,000.00 pursuant to the fraudulent bills submitted by Grinberg and O. Grinberg through Five Boro PLLC.

204.    Grinberg's and O. Grinberg's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

205.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FOURTEENTH CAUSE OF ACTION**
**Against Dougherty and Bonaparte (Aiding and Abetting Fraud)**

206.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 205 above.

207.    Dougherty and Bonaparte knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Five Boro PLLC, Grinberg, and O. Grinberg.  The acts of Dougherty and Bonaparte in furtherance of the fraudulent scheme include:  (i) knowingly performing medically unnecessary psychological services in exchange for payment of money from Five Boro PLLC, Grinberg, and O. Grinberg; (ii) knowingly issuing fraudulent reports in exchange for payment of money from Five Boro PLLC, Grinberg, and O. Grinberg; and (iii) knowingly causing fraudulent billing to be issued in exchange for payment of money from Five Boro PLLC, Grinberg, and O. Grinberg.

208.    The conduct of Dougherty and Bonaparte in furtherance of the fraudulent scheme was significant and material.  The conduct of Dougherty and Bonaparte is a necessary part of and

is critical to the success of the fraudulent scheme because without their actions, including the performance of the fraudulent psychological services, issuance of the fraudulent reports, and participation in the fraudulent billing, there would be no opportunity for Five Boro PLLC, Grinberg, and O. Grinberg to obtain payment from GEICO and from other insurers.

209.    Dougherty and Bonaparte aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Five Boro PLLC for medically unnecessary services or illusory services that were not compensable under New York's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

210.    The conduct of Dougherty and Bonaparte caused GEICO to pay more than $149,000.00 based upon the fraudulent charges submitted through Five Boro PLLC.

211.    Dougherty's and Bonaparte's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

212.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against Grinberg, O. Grinberg, Dougherty, and Bonaparte
### (Unjust Enrichment)

213.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 212 above.

214.    As set forth above, Grinberg, O. Grinberg, Dougherty, and Bonaparte have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

215.    When GEICO paid the bills and charges submitted by or on behalf of Five Boro PLLC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

216.    Grinberg, O. Grinberg, Dougherty, and Bonaparte have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

217.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

218.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $149,000.00.

## JURY DEMAND

219.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Grinberg and O. Grinberg, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $729,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

B.    On the Second Cause of Action against Grinberg, O. Grinberg, and Dougherty, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$729,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      C.     On the Third Cause of Action against Grinberg and O. Grinberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $729,000.00, together with punitive damages, costs, and interest;

      D.     On the Fourth Cause of Action against Dougherty, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $729,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

      E.     On the Fifth Cause of Action against Grinberg, O. Grinberg, and Dougherty, more than $729,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper;

      F.     On the Sixth Cause of Action against Grinberg and O. Grinberg, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,249,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      G.     On the Seventh Cause of Action against Grinberg, O. Grinberg, Dougherty, and Bonaparte, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,249,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

      H.     On the Eighth Cause of Action against Grinberg and O. Grinberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,249,000.00, together with punitive damages, costs, and interest;

I. On the Ninth Cause of Action against Dougherty and Bonaparte, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,249,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

J. On the Tenth Cause of Action against Grinberg, O. Grinberg, Dougherty, and Bonaparte, more than $1,249,000.00 in compensatory damages, plus costs and interest, and such other and further relief as this Court deems just and proper;

K. On the Eleventh Cause of Action against Grinberg and O. Grinberg, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L. On the Twelfth Cause of Action against Grinberg, O. Grinberg, Dougherty, and Bonaparte, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $147,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M. On the Thirteenth Cause of Action against Grinberg and O. Grinberg, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $147,000.00, together with punitive damages, costs, and interest;

N. On the Fourteenth Cause of Action against Dougherty and Bonaparte, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $147,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

O.     On the Fifteenth Cause of Action against Grinberg, O. Grinberg, Dougherty, and

Bonaparte, more than $147,000.00 in compensatory damages, plus costs and interest, and such

other and further relief as this Court deems just and proper; and

P.     For such other and further relief as to the Court may seem just, proper, and

equitable.

Dated:     Uniondale, New York
           April ___, 2014

                              RIVKIN RADLER LLP


                              By:_____
                                    Barry I. Levy (BL 2190)
                                    Michael P. Versichelli (MV 2692)
                                    Max Gershenoff (MG 4648)
                                    Brian L. Bank (BB 5995)
                              926 RXR Plaza
                              Uniondale, New York 11556-0926
                              Telephone:     (516) 357-3000
                              Facsimile:     (516) 357-3333

                              *Counsel for Plaintiffs, Government Employees
                              Insurance Co., GEICO Indemnity Co, GEICO
                              General Insurance Company and GEICO Casualty
                              Co.*

2595082